**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPRINT SOLUTIONS, INC. and SPRINT COMMUNICATIONS COMPANY L.P., <br><br> Plaintiffs, <br><br> v. <br><br> JACKY CHAN, DRAGON TELECOMMUNICATION COMPANY, LAMBDA PACIFIC TECH, LLC, ZHI XI ZHANG a/k/a ANSON ZHANG, YONG LAM, and CHING LAM, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No: _16-cv-6027_ <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Sprint Solutions, Inc. and Sprint Communications Company L.P. (collectively "Sprint" or "Plaintiffs"), hereby file this Complaint for Damages and Injunctive Relief against Jacky Chan, Dragon Telecommunication Company, Lambda Pacific Tech, LLC, Zhi Xi Zhang a/k/a Anson Zhang, Yong Lam, and Ching Lam (collectively, "Defendants") and state:

### INTRODUCTION

1.       Sprint sells wireless handsets and other mobile devices under various brands, including, Sprint, Sprint Prepaid, Boost Mobile, Virgin Mobile, payLo, and Assurance Wireless ("Sprint Phones" or "Phones") for use on Sprint's wireless network at prices significantly below the wholesale price of the Phones to make them more widely accessible to consumers. Defendants and their co-conspirators are perpetrators of an unlawful scheme (the "Bulk Handset Trafficking Scheme" or the "Scheme") to profit from the illegal acquisition and resale of new Sprint Phones by stealing the substantial financial investment that Sprint makes in its Phones, for their own profit and to the detriment of Sprint and its customers.

2.      Defendants and their co-conspirators acquire new Sprint Phones through various methods, including the use of "runners" and "credit mules."[1]   As part of the Bulk Handset Trafficking Scheme, the Phones, which may be purchased and sold multiple times, ultimately end up in the hands of someone other than the consumer with whom Sprint has a business relationship.  Along the way, the Phones are often "unlocked" so they will operate on wireless networks other than Sprint.  Often the ultimate user of the phone is located overseas, in a country where the wireless service provider does not underwrite the cost of new phones.

3.      Defendants' Scheme takes advantage of the fact that Sprint invests in its Phones to reduce the costs for its consumers; whereas wireless service providers in other countries do not.  By obtaining the new Sprint Phones under false or fraudulent pretenses from Sprint and reselling or diverting them to other markets where phones are not subsidized, the Scheme converts Sprint's investment dollars into profits for Defendants and their co-conspirators.  Although Defendants may participate in less than all of the steps in the process of diverting Sprint Phones, each of Defendants' acts is a violation of Sprint's rights and causes significant damage to Sprint.  Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to Sprint by the entire Scheme.

4.      The Scheme causes tremendous harm to Sprint and to consumers.  In addition to the pecuniary losses caused by Defendants' theft of Sprint's mobile devices, investment in the Phones, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct has harmed Sprint's relationships with its customers, dealers, retailers, and others.

---

[1] A "runner" is an individual or entity that makes multiple purchases of new Sprint Phones on behalf of phone traffickers like Defendants.  A "credit mule" is an individual or entity that signs up for wireless service with Sprint – never intending to comply with the terms of the agreement – to obtain new subsidized Sprint Phones for phone traffickers like Defendants.  A copy of the Federal Trade Commission's June 2014 Consumer Credit Mule Warning is attached hereto as **Exhibit A**.

Defendants' Scheme also involves unlawfully accessing Sprint's protected computer systems and wireless network; trafficking of Sprint's protected and confidential computer passwords; willful infringement of Sprint's trademarks; and/or stealing legitimate customer upgrades.  Defendants have caused substantial damage to Sprint's brand, image, and reputation.

5.     Sprint seeks to recover damages for the harm caused by Defendants' Bulk Handset Trafficking Scheme, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Scheme.

6.     All conditions precedent to filing this action have been performed, waived or excused.

7.     Sprint has retained the undersigned attorneys to represent it in this action and has agreed to pay its attorneys a reasonable fee for their services.

**PARTIES, JURISDICTION, AND VENUE**

8.     This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

9.     Sprint Solutions, Inc. is a Delaware corporation with its principal place of business in Reston, Virginia.

10.     Sprint Communications Company L.P. is a Delaware limited partnership with its principal place of business in Overland Park, Kansas.

11.     Defendant Jacky Chan ("Chan") is an individual and a resident of Hong Kong and is personally engaged in, and helped facilitate the improper conduct described herein; including soliciting and trafficking new Sprint Phones from the United States to Hong Kong.   On information and belief, Defendant Jacky Chan is an owner of Defendant Lambda Pacific, a New York limited liability company, travels to New York to traffic in new Phones, and routinely does business in New York through his company and his agents.

3

108148031.4

12.     Defendant Yong Lam is an individual and a resident of Hong Kong and is personally engaged in, and helped facilitate the improper conduct described herein; including trafficking Sprint Phones to Hong Kong.  On information and belief, Defendant Yong Lam is an owner of Defendant Lambda Pacific and a partner in Defendant Dragon Telecommunication, regularly does business in New York through his company and agents, and travels to New York to traffic in new Phones.

13.     Defendant Dragon Telecommunication Company ("Dragon Telecommunication") is a Hong Kong company with a principal place of business at RM 2906-2908, 29/F, No.1 Hung To Road, Kwun Tong, KLN., Hong Kong.  Defendant Jacky Chan is a managing director. Dragon Telecommunication solicits and does business in New York directly and through its agents, Defendants Zhang and Ching Lam, and its affiliate Defendant Lambda Pacific, and also does business via the website dragontelehk.com.

14.     Defendant Lambda Pacific Tech, LLC ("Lambda Pacific") is a New York limited liability company.  Lambda Pacific's principal place of business is at 560 Riverside Drive, 19F, New York, NY 10027 and is the New York affiliate of Defendant Dragon Telecommunication owned by Defendants Chan, Yong Lam, and Ching Lam.

15.     Defendant Zhi Xi Zhang a/k/a Anson Zhang ("Zhang") is an individual and resident of New Jersey and is personally engaged in, and helped facilitate, the improper conduct described herein, including trafficking Sprint Phones to Hong Kong.  Upon information and belief Anson Zhang resides at 17-16 Morlot Avenue, Fair Lawn, NJ 07410 and is an agent for Defendants Jacky Chan and Dragon Telecommunication.

16.     Defendant Ching Lam is an individual and resident of New York and is personally engaged in, and helped facilitate, the improper conduct described herein.  Upon

information and belief Ching Lam resides at 560 Riverside Dr., Apt 19F, New York, NY 10027. Defendant Ching Lam is the organizer and owner of Defendant Lambda Pacific and an agent for Defendants Jacky Chan and Dragon Telecommunication.

17.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because Sprint's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* arise under federal law and because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Sprint's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

18.     This Court has personal jurisdiction over the Defendants pursuant to N.Y. C.P.L.R. § 302 (McKinney 2008).  Defendants Dragon Telecommunication, Chan, Yong Lam, and Zhang are subject to the personal jurisdiction of this Court because they have conducted, engaged in and carried out business ventures within the State of New York, have committed tortious acts within the State of New York, and have engaged in substantial and not isolated activity within the State of New York.  Defendant Lambda Pacific is subject to the personal jurisdiction of this Court because it is a New York limited liability company with its principal place of business in the State of New York.  Defendant Ching Lam is subject to the personal jurisdiction of this Court because she is a resident of the State of New York.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

108148031.4

## SPRINT'S BUSINESS MODEL

20.     Sprint and its affiliates offer a comprehensive range of telecommunications services to consumers, businesses, and government users.  Sprint currently serves approximately 56 million customers nationwide, and is widely recognized for developing, engineering and deploying innovative technologies.  The Sprint companies and affiliates highly value the outstanding business reputation they have worked hard to develop.

21.     Sprint's wireless program enables Sprint's customers to choose from a variety of monthly voice and data plans for use on cutting edge devices on the Sprint wireless network.  In addition to being available through Sprint online, over the phone with authorized Sprint service representatives, and in its stores, Sprint Phones and wireless service are sold through authorized Sprint dealers and retailers around the country, with whom Sprint has contractual relationships.

22.     Sprint's business model is based upon Sprint's ability to deliver affordable, innovative, and desirable products and services to consumers.  Therefore, Sprint assists its customers in their acquisition of Sprint Phones for use on the Sprint wireless network by selling the Phones for substantially less than what Sprint pays to the manufacturers for the Phones.  Sprint recoups the money it loses on the Phones through revenue earned on the sale of Sprint service, which customers must use to transmit and receive voice, text, and data on the Sprint Phones.

23.     In addition to subsidizing Sprint Phones, Sprint also offers its customers the option of paying off the Phone in installments or leasing a Phone from Sprint, as well as providing discounts, rebates, and other incentive programs by which Sprint heavily invests in the Phones to the benefit of its customers.  These types of substantial subsidies and investment programs are not offered by telecommunications carriers outside the United States; generally, those consumers must pay full price for the phones from the manufacturers.  The full value of the

6

Phone in the case of theft or the difference between the value and the subsidy price offered by Sprint is the profit sought by handset traffickers like Defendants.

24.     Sprint Phones are sold subject to Terms and Conditions ("Terms and Conditions") which conspicuously limit the sale and use of the Phones.  A copy of the Terms and Conditions is attached hereto as **Exhibit B**.  These Terms and Conditions are set forth in printed inserts that are included with the purchase of every Sprint Phone and are available on Sprint's website.

25.     To make its customers' experience as convenient as possible, Sprint provides various methods for its customers to manifest their agreement to the Terms and Conditions, depending on the type of service they obtain and the method and sales channel through which they activate their service.  In some cases, customers are asked to sign a written contract, in others they acknowledge their agreement orally by phone, and in other situations they may indicate their agreement by clicking the appropriate buttons on a website.  In the case of pay-as-you-go or prepaid service, customers confirm their agreement by acquiring a Phone in a package that indicates that their purchase or use of the phone constitutes their agreement to the Terms and Conditions.  All of the methods used by Sprint for obtaining its customers' agreement to the Terms and Conditions are legally valid and appropriate, and the Terms and Conditions constitute a valid and binding contract between Sprint and each of its customers.

26.     Sprint is able to offer its Phones to customers at reduced prices only if the Phones are used as intended on the Sprint wireless network.  Manufacturers that produce wireless phones for Sprint install proprietary software, requested and paid for by Sprint, on the Sprint Phones. Among other things, this software is intended to prevent the Phones from being used outside the Sprint network absent a valid request from a legitimate Sprint customer in compliance with governing requirements.

108148031.4

27.     Wireless technology is constantly changing and improving, and the wireless industry is intensely competitive.  Sprint expends substantial resources to maintain its position as an industry leader and to ensure that its network, handsets, and all of its products and services are at the cutting edge of the latest technological developments.  Providing its customers with the highest quality and most advanced technology is a key differentiator for Sprint and central to its business strategy.  Sprint is constantly and aggressively developing, engineering, and deploying innovative technologies to benefit its customers.

28.     Sprint invests heavily in efforts to provide its customers with the most up-to-date wireless handsets, and shoulders most or all of the cost of purchasing a new phone for its customers.  Sprint makes phones available to new customers at a low cost when they initiate wireless service, and also provides new subsidized phones to existing customers at regular intervals.

29.     Sprint made a particularly significant and widely publicized investment for its customers in the Smartphone market.  As reported in The Wall Street Journal, Sprint agreed to buy 30.5 million iPhones from Apple over four years, at a cost of more than $20 billion.  Copies of newspaper articles discussing Sprint and the iPhone are attached hereto as **Composite Exhibit C**.  As the demand, and therefore the price, for Smartphones in various world markets skyrockets, Sprint's subsidized Smartphones are a particularly attractive and lucrative target for participants in the Bulk Handset Trafficking Scheme.

## SPRINT'S TRADEMARK RIGHTS

30.     Sprint Communications Company L.P. owns federal trademark registrations for the standard character and stylized Sprint® marks (collectively, the "Sprint Communications Marks").  Sprint Solutions, Inc. has been assigned the right to use and enforce the Sprint

8

Communications Marks.  Copies of the certificates of registration issued by the United States Patent and Trademark Office are attached hereto as **Composite Exhibit D**.  The stylized Sprint Communications Marks are depicted below:

 

31.     Sprint has been assigned the right to use and enforce the standard character and stylized Virgin Mobile, payLo, Assurance Wireless, and Boost Mobile trademarks (collectively, the "Assigned Marks"), the latter of which are depicted below:

  



The Sprint Communications Marks and Assigned Marks will collectively be referred to as the "Sprint Marks."

32.     Sprint uses the Sprint Marks on and in connection with its telecommunications products and services.

33.     Sprint Marks have become an intrinsic and essential part of the valuable goodwill and property of Sprint, who protects the Sprint Marks.  The Sprint Marks are well established and well known to customers and the trade as symbols identifying and distinguishing Sprint's products and services, and signifying distinctive products and services of high quality.  Only Sprint and its expressly authorized, affiliated agents are permitted to use the Sprint Marks.  The Sprint Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Sprint.

## DEFENDANTS' MISCONDUCT

34.     Sprint has discovered that, although large quantities of its Phones are being purchased throughout the United States, a significant number of these Phones are not being used on the Sprint wireless network.  Instead, entities and individuals such as Defendants and their co-conspirators, with no intention of lawfully connecting to or using the Sprint wireless network, are fraudulently acquiring and reselling new Sprint Phones in bulk quantities.  The Phones are acquired, either directly by Defendants or through their co-conspirators, through illicit means, such as runners and/or credit mules, and then sold for a substantial profit and ultimately shipped overseas, where they can be used on other wireless carriers' networks, or shipped to other domestic traffickers, who add them to larger shipments headed overseas.  The Phones are usually taken out of their original packaging, and all accessories, warranties, and manuals are removed, before being shipped overseas.  The Phones are often unlocked by Defendants or their co-conspirators, to raise their value and prepare them for use on foreign carriers.  Defendants undertake these actions for their own profit.

35.     Once a Sprint Phone is unlocked and/or shipped overseas to be used on other wireless networks, Sprint no longer has a revenue source to recoup its investment on that Phone.

36.     If Sprint identifies a Phone as connected with theft, fraud, or other loss, the electronic serial number (ESN) is red-flagged in Sprint's system and the Phone can no longer be used on the Sprint network.  This is done to protect Sprint from further harm and in an attempt to deter criminal activity.  The Phone is thereafter referred to in the handset trafficking community as having a "Bad ESN."  As it is no longer a functioning Sprint Phone, the only value of a Bad ESN Phone is in unlocking the handset for use on other networks and overseas resale.

108148031.4

37.    Defendants are knowingly and willfully engaged in an enterprise that traffics in and resells Sprint Phones.  Defendants have acquired and sold large quantities of Sprint Phones through various co-conspirators.  While the complete extent of Defendants' activities in the Bulk Handset Trafficking Scheme is not yet known, Defendants are actively involved in virtually all of the integral components of the conspiracy.

38.    Defendants are not authorized Sprint dealers or retailers.  Defendants have no legitimate connection to Sprint.

39.    In May 2016, Defendant Chan of Dragon Telecommunication contacted Sprint via email seeking to purchase large quantities of iPhones, Samsung phones, and spare parts and accessories associated with these devices.   A copy of Chan's e-mail for Dragon Telecommunication is attached as **Exhibit E.**  This email was flagged and forwarded to Sprint's Fraud Department for further investigation.

40.    Dragon Telecommunication's website at dragontelehk.com shows that Dragon Telecommunication's primary business is the wholesale of new mobile phones, refurbished mobile phones, mobile phone parts, and mobile phone accessories, for several brands, such as Apple, Samsung, HTC, Nokia, Sony Ericcson, and Blackberry.   Screenshots of Dragon Telecommunication's website are attached as **Exhibit F**.   On their website, Dragon Telecommunication advertises for sale several of these mobile phone brands' products and encourage potential customers to contact Chan to establish a business relationship.  Specifically, Dragon Telecommunication states that they are looking to work with mobile phone wholesalers.

41.    Additionally, Dragon Telecommunication advertises on their website that they have facilities where they, *inter alia*, repackage phones.   Photographs on the Dragon Telecommunication Website show numerous phones outside of the packaging.

42.     Dragon Telecommunication boasts on their website that they have sold 5 million mobile phones per year, and their total sales revenue has reached 150 million U.S. dollars. Defendant Dragon Telecommunication also admits that they distribute their illicitly obtained phones across Asia, including mainland China, the Middle East and Africa.

43.     From May through July 2016, undercover investigators for Sprint engaged in numerous conversations with Chan, Yong Lam, and a Sales Manager for Dragon Telecommunication, discussing Defendants' specific requests to purchase thousands of new Sprint iPhones per week.

44.     On May 12, 2016, an investigator for Sprint contacted Dragon Telecommunication via WhatsApp and initiated communication with Chan, Dragon Telecommunication's Managing Director, to confirm that Dragon Telecommunication and Chan buy and sell new Sprint Phones. Chan confirmed. The May 12, 2016 – July 19, 2016 WhatsApp communications between Chan and the investigator attached hereto as **Composite Exhibit G**; a picture of Chan's business card identifying him as Dragon Telecommunication's Managing Director is included therein. *Id.* at 14. Chan confirmed that Defendants purchase new Sprint Phones in bulk that are either locked or unlocked and immediately export the phones for resale overseas. *Id*. at 1-3. Chan also confirmed that Defendants are interested in and will purchase up to 5,000 phones per order. *Id.* at 4. Chan stated that he engages in business dealings in the United States. *Id.* at 6.

45.     In the same conversation, Chan negotiated with the investigator to purchase ten (10) new locked Sprint iPhone 6S. *Id.* at 7-10. Chan offered to purchase the new Sprint iPhones for $380 per phone, which was accepted. *Id.* at 8. Chan told Sprint's investigator that he would connect the investigator with his agent in New York to inspect the Phones and facilitate the purchase. *Id.* at 9.

46.     On May 16, 2016, the investigator communicated with Chan via WhatsApp to inquire about the transaction.  *Id.* at 13.  Chan reiterated Defendants' interest in the new Sprint Phones.  *Id.* However, Chan stated that his agent, Ching Lam, was temporarily out of New York and he asked the investigator to ship the Sprint Phones to Chan in Hong Kong using Chan's FedEx account.  *Id*.  Chan attempted to convince the investigator to trust him with the Phones by explaining that he regularly makes phone purchases from U.S. companies.  *Id.* at 13.

47.     In the same conversation, Chan stated that he, as a representative of Dragon Telecommunication, exhibits at the CTIA convention (an industry trade association meeting for wireless communications) every year and will be exhibiting at CTIA this upcoming September, 2016 in Las Vegas.  *Id.* at 15.

48.     On June 22, 2016, Chan and Sprint's investigator resumed communications.  *Id.* at 16-17.  Chan and the investigator agreed on completing a sample transaction for the purchase of ten (10) Sprint 16GB iPhone 6S for a price of $350 per phone.  *Id.* at 19.  Chan informed the investigator that he had another agent in New York, with whom Chan would connect the investigator to complete the purchase.  *Id*. at 19-20.  Chan identified his second agent as Defendant Zhang and provided the investigator with Zhang's telephone number.  *Id.* at 20-21.  Chan told the investigator that Zhang will contact the investigator to select a time and place to meet for the purposes of completing the sample transaction.  *Id.*

49.     On June 22, 2016, Sprint's investigator communicated with Zhang via telephone, using the telephone number Defendant Chan provided to the investigator.  Zhang and the investigator scheduled a meeting to complete the transaction at 1:00 PM on Friday, June 24, 2016 at a Panera Bread located in Edison, New Jersey.

50.     On June 24, 2016, Sprint's investigator met with Zhang and an associate at the designated location.   The  investigator retrieved the Sprint iPhones from his car, and brought them inside for Zhang to inspect. Zhang stated that to inspect the phones, he needed to unseal each phone to confirm they were genuine new Sprint Phones.  Zhang, and his associate unsealed each Sprint iPhone.  The Sprint Terms and Conditions were inside each Sprint iPhone that Zhang and his associate unsealed and opened.   Zhang's associate checked the ESN of each phone. Zhang's associate attempted to verify the ESNs of the Phones through an unapproved website, which he accessed from his mobile phone.   Zhang admitted during the meeting that he has purchased new iPhones in the United States to sell in China.

51.     Zhang then paid the investigator $3,500.00 in cash, in the form of $100.00 bills for the ten (10) new Sprint Phones and called Chan from his phone and spoke with him in Chinese.  Following their conversation, Zhang told the investigator that he advised Chan that the deal was satisfactory.  The investigator followed up with Chan by sending him a text message confirming the deal was complete, to which Chan responded by thanking the investigator.  *Id.* at 23.  Zhang told the investigator that he would ship the new Sprint iPhones to Chan in Hong Kong and that the investigator should follow up with Chan regarding ongoing transactions with Defendants.

52.     Upon leaving the meeting, the investigator observed Zhang and his associate enter a Silver Lexus SUV with a New York license plate registered to Shi Wei Zhang at an address in College Point, New York.

53.     On June 28, 2016, Chan contacted Sprint's investigator via WhatsApp and asked the investigator if he had 200 new Sprint iPhones to sell to Defendants.  Chan asked for an IMEI[2]

---

[2] IMEI means "international mobile equipment identifier;" the term is synonymous with ESN.

list for the phones that were to be included in the transaction.  *Id.* at 25.  Chan also asked the investigator if he always has an inventory with this quantity of phones.  *Id.*  The investigator told Chan that he usually has 300 to 500 iPhone 6S on a weekly basis. *Id.* at 26.  Chan indicated that Defendants had an interest in ongoing larger transactions and asked the investigator for his company's information.  *Id.* at 26-29.  Chan told the investigator that after he receives the ten (10) Phones from the June 24, 2016 transaction, and tests the Phones to see whether he can unlock them, he wanted to fly to New York to meet with the investigator to cement an ongoing deal for new Sprint Phones, as long as the investigator could ensure he will have 300-500 pieces weekly for Defendants. *Id.* at 30-31.

54.     On June 30, 2016, Sprint's investigator contacted Chan via WhatsApp inquiring as to whether Chan received the Sprint Phones from the June 24, 2016 transaction. *Id.* at 32. Chan stated that he did not receive the phones yet, but reiterated his interest in flying to New York to meet with the investigator.  *Id.*  Chan again asked for assurance from the investigator that he had a weekly stock of 300 to 500 new Sprint iPhones that Defendants could purchase on an ongoing basis for export.  *Id.*

55.     On July 5, 2016, Sprint's investigator continued his conversation with Chan via WhatsApp and Chan verified that he received the ten (10) Sprint Phones from the June 24, 2016 transaction.  *Id.* at 34.  Chan inquired about the quantity of phones the investigator could sell to Defendants and the investigator told Chan that he had 250 new Sprint Phones and was expecting an additional 250 new Sprint Phones by Friday of that week.  *Id*.  Chan asked for specifications, such as color and gigabyte size. *Id.* at 35-36.  Chan confirmed that he would receive an invoice and stated that he would send a purchase order to the investigator and after Defendants inspected the stock, he would transfer money to the investigator from his U.S. company's account.  *Id.* at

37.   Chan reiterated his desire to fly to the U.S. and continued to discuss potential dates and locations for a meeting in the U.S. to confirm an ongoing deal for 300-500 new Sprint iPhones needed by Defendants on a weekly basis.  *Id.* at 38-42.

56.   On July 6, 2016,  Chan continued his conversation with Sprint's investigator via WhatsApp and stated that Defendant Zhang would inspect the Phones involved in the second transaction.   *Id.* at 46.   Chan, who is an owner of Defendant Dragon Telecommunication, informed the investigator that he had opened a new affiliate company in the U.S., which he identified as Defendant Lambda Pacific Tech, LLC.  *Id.* at 47.   Chan stated that Lambda Pacific has an account with Bank of America and identified his partner, Defendant Ching Lam, as Lambda Pacific's contact person.  *Id.* at 48-49.   Chan stated that once Zhang finishes inspecting the stock, Chan will notify Ching Lam, who will transfer money from Lambda Pacific's account to the investigator.  *Id.* at 49.   Chan identified Lambda Pacific's company address as 560 Riverside Drive, 19F, New York, NY 10027.   *Id.* During the course of their investigation, Sprint's investigators identified Ching Lam as resident at Lambda Pacific's business address - 560 Riverside Drive, Apt. 19F.

57.   In the same conversation, Chan stated that a reason he wanted to travel to the U.S. was to meet with the investigator, Zhang, and Ching Lam together to coordinate future ongoing large transactions.  *Id.*  Chan and the investigator tentatively agreed to meet in New York the week of July 18, 2016.  *Id.*

58.   On July 11, 2016, Chan again contacted Sprint's investigator via WhatsApp to discuss the proposed meeting for Chan to purchase new Sprint Phones from the investigator.  *Id.* at 51.  Chan stated that Chan's brother and business partner had a trip planned to New York and would meet with the investigator to complete the transaction for Defendants.  *Id.*   The

investigator later identified Chan's brother, who Chan proposed to meet with the investigator, is Defendant Yong Lam.  **Exhibit H** at 1; **Exhibit J** at 1-2.  Chan explained that Yong Lam is one of his business partners and Defendant Zhang works for Yong Lam.  *Id.* at 54, 57.

59.     On July 19, 2016, Chan again contacted Sprint's investigator via WhatsApp to advise of Yong Lam's travel plans to the United States.  *Id.* at 54-55.  Chan stated that Yong Lam would arrive in New York on July 27, 2016.  *Id.*  Chan and the investigator discussed Defendants' request to purchase 500 new Sprint Phones.  *Id.* at 57.

60.     The investigator offered and Chan agreed that Defendants would purchase 500 brand new, locked to Sprint, rose gold color iPhones - 200 16GB and 300 64GB phones.  *Id.* at 58.  The investigator asked if Chan wanted to send a purchase order for the phones.  *Id.* at 59.

61.     On the same date, Chan created a separate group text via WhatsApp, called "JC&DRAGOM" [sic].  The July 19, 2016 – July 22, 2016 WhatsApp communications between Chan, Yong Lam, and the investigator attached hereto as **Composite Exhibit H.**  Chan introduced Sprint's investigator to Yong Lam via the WhatsApp group text.  **Exhibit H** at 1.  Chan explained that Yong Lam would be in New York on July 28, 2016 and asked the investigator to discuss with Yong Lam the schedule to meet for the purchase of the 500 new Sprint Phones.  *Id.* at 2.  Yong Lam advised that he would be in the United States for at least ten days on business.  *Id.* at 5.  Yong Lam confirmed that he would meet with the investigator to collect the 500 new Sprint iPhone 6S for Defendants.  *Id.* at 4-5.

62.     On July 22, 2016, Alvin Lau, Sales Manager for Dragon Telecommunication Company, e-mailed Sprint's investigator, enclosing Dragon Telecommunication's purchase order for 500 brand new "US Spec Sprint Lock" rose gold Apple iPhone 6S (200 16GB for $350 each, and 300 64GB for $425 each) – just as Chan and Yong Lam had confirmed over text message

with Sprint's investigator.   Dragon Telecommunication's E-mail correspondence and enclosed Purchase Order are attached hereto as **Composite Exhibit I**.   Chan added Alvin Lau ("Lau"), Dragon Telecommunication Sales Manager to the group text with Chan, Yong Lam, and the investigator.   **Exhibit H** at 12-16.   Lau confirmed he sent Dragon Communications' purchase order, which totals $197,500.00.   *Id.*

63.   On the same date, Sprint's investigator communicated with Yong Lam in a separate conversation via WhatsApp.   The July 22, 2016 – July 25, 2016 WhatsApp communications between Yong Lam and the investigator attached hereto as **Composite Exhibit J.** Yong Lam and the investigator discussed Yong Lam's upcoming trip to the United States.   *Id.* at 2.   When Sprint's investigator asked Yong Lam whether the trip was just for the purposes of purchasing the Sprint Phones from the investigator, Yong Lam replied that he flies [to the United States] every one or two months for business.   *Id.*   Yong Lam explained that he has another business in the United States related to "the cellphones," but declined to provide the name.   *Id.* at 3-4.   Yong Lam told the investigator for Sprint that Defendants "*can move easily 20k-30 peace [sic] phone weekly!  as we dose [sic] last year!*"   *Id.* at 7.   Yong Lam ended the conversation by confirming that he would meet with Sprint's investigator on Friday, July 29, 2016.   *Id.* at 8.

64.   On information and belief, Dragon Telecommunication, Lambda Pacific, and the individuals actively participating in their illicit cell phone business traffic a high volume of new Sprint Phones every week.   In their conversations with Sprint's investigator, Defendants have confirmed their desire and ability to purchase thousands of phones every week – even up to 30,000 phones per week – a volume Defendants reportedly reached last year.   Defendants' business is dependent on a steady stream of illegally obtained new Phones so if they do not obtain the 500 brand new Sprint iPhones from Sprint's undercover investigators during the week

of July 29, 2016 and the steady stream of 300-500 new Sprint Phones per week, they will be obligated to purchase at least the same quantity from another source during the same time frame and going forward on a weekly basis.

## SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

65.     Defendants' actions substantially harm Sprint in several ways, including inter alia: (1) Sprint is deprived of the opportunity to recoup its substantial investment in Sprint Phones; (2) Sprint is deprived of the opportunity to earn profits by providing wireless service to legitimate Sprint consumers; (3) Defendants' actions seriously and irreparably interfere with Sprint's relationships with its dealers, retailers and customers; and (4) Defendants' infringement of the Sprint name and Marks causes significant ongoing and irreparable losses and harm to Sprint's brand, image, and reputation.  All of these factors undermine Sprint's competitive edge in the cellular phone industry.

66.     The conduct of Defendants, their unknown co-conspirators, and others who engage in the unlawful acquisition and resale of new Sprint Phones has also resulted in shortages of available Sprint Phones, particularly the most in-demand models.   This misconduct substantially harms Sprint and its relationship with dealers, retailers, and consumers because Sprint is not able to supply sufficient handsets to satisfy the demand from legitimate consumers who, as a result, go elsewhere for their telecommunications services.

67.     Sprint suffers additional, irreparable harm when its Phones are removed, by Defendants or their co-conspirators, from the original packaging and altered because Sprint is deprived of the means to control the quality of its product.  This becomes especially damaging where a potential legitimate Sprint customer acquires a Phone from Defendants or their co-conspirators, that the customer believes is a genuine Sprint Phone, with all of the attendant

benefits and is later disappointed in Sprint because the Phone does not work as intended on the Sprint network because it has been denominated a Bad ESN Phone or otherwise.

68.     Furthermore, the process of unlocking and reselling a Sprint Phone voids the manufacturer's warranty on the device.  The unlocked repackaged Sprint Phones are then resold without the original manufacturer's warranty documentation.  Both consumers and Sprint are harmed when a Sprint Phone that has been altered or sold by Defendants or their co-conspirators is submitted for warranty repair.  Consumers who purchase Sprint Phones from Defendants or their co-conspirators are unable to obtain warranty service in the event they experience problems with their Phones.  As a result, Sprint's reputation suffers further.

69.     Additionally, confused customers, relying on the Sprint Marks on the Phones they purchased from Defendants, look to Sprint to resolve their questions.  Sprint incurs substantial costs associated with calls to its customer relations and department to resolve the issues created by Defendants and their co-conspirators.

70.     Sprint's reputation is further damaged by its inability to assist those consumers who buy Sprint Phones from Defendants, because despite bearing the Sprint Marks, they are no longer valid Sprint Phones because the actions of Defendants and their co-conspirators voided the warranties and as Bad ESN phones, they cannot be activated on the Sprint network.

71.     Defendants' conduct has resulted in the dilution of the Sprint Marks; substantial harm to Sprint's business reputation and goodwill; a greater likelihood of confusion, mistake, and deception as to the source of origin of Sprint products unlawfully sold by the Defendants and confusion as to what if any relationship exists between Sprint and Defendants.

108148031.4

## CIVIL LITIGATION AGAINST OTHER PHONE TRAFFICKERS

72.     Federal courts have recognized that conduct similar to Defendants' conduct is unlawful.

73.     In addition to Sprint, T-Mobile USA, Inc., TracFone Wireless, Inc., Nokia Corporation, and AT&T Mobility LLC have each filed multiple lawsuits in numerous federal courts across the country against other traffickers engaged in the practice of defrauding legitimate consumers by acquiring large quantities of wireless telephones and reselling them for profit.  Each of those companies has succeeded in obtaining Final Judgments and Permanent Injunctions.  Copies of several examples of Final Judgments and Permanent Injunctions are attached hereto as **Composite Exhibit K.**  A defendant in one case who continued trafficking in phones in violation of an injunction issued by the U.S. District Court for the Southern District of Texas was charged with criminal contempt of court and sentenced to serve 57 months in prison. Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, and Judgment of Criminal Contempt are attached hereto as **Composite Exhibit L.**

## CRIMINAL INVESTIGATION AND
## PROSECUTION OF PHONE TRAFFICKING

74.     Phone traffickers like Defendants have been the subject of numerous criminal investigations and prosecutions across the country.  Some examples are:

   a.     In August 2014, the United States Attorney for the District of Minnesota announced the indictment of 20 individuals engaged in the illegal acquisition and resale of tens of thousands of Smartphones to the black markets of the Middle East and China.  A joint task force comprised of the U.S. Secret Service, the Minnesota Financial Crimes Task Force, and the St. Paul Police Department

21

investigated and then apprehended members of the "Mustafa Organization," who had been using runners, engaged in contract and subscription fraud, and robbery to acquire large quantities of subsidized phones for overseas resale.

b.      In March 2013, the California Attorney General charged two individuals with trafficking nearly $4M in wireless phones to Hong Kong over an 8 month period.

c.      On or about February 25, 2013, federal law enforcement authorities, including agents from the Federal Bureau of Investigation, the United States Secret Service, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, raided a warehouse belonging to a phone trafficking company called Wireless Buybacks in Elkridge, Maryland, pursuant to a search warrant and found the facilities were being used to harbor stolen Sprint Phones.  Sprint filed suit against Wireless Buybacks and its affiliates the following day.

d.      On August 21, 2012, federal Homeland Security agents and SWAT teams conducted a raid on facilities operated by handset trafficker Ace Wholesale and on the home of the company's CEO, Jason Floarea.  Later the same day, Sprint filed suit in federal court against Ace Wholesale, Floarea, and several affiliated entities and persons asserting handset trafficking claims similar to those asserted here.  On October 16, 2014, Mr. Floarea, pled guilty to Interstate Transportation of Stolen Property, in part in connection with trafficking Sprint Phones.

e.      An FBI sting operation in Philadelphia that began with wireless phone trafficking resulted in the conviction of 16 individuals on terrorism charges, when it turned out that the proceeds from their phone trafficking and other illegal conduct was being funneled to the terrorist organization Hezbollah.

22

Copies of court documents, press releases, and news reports regarding these incidents are attached hereto as **Composite Exhibit M.**

<u>**COUNT ONE**</u>

**UNFAIR COMPETITION**

75.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

76.     Sprint sells Sprint Phones for deeply discounted prices in order to make them more affordable to the public and recoups the discounts through the sale of Sprint wireless service.  Defendants, without any comparable manufacturing or purchasing costs, take advantage of Sprint's business model by obtaining Sprint Phones at discounted rates and reselling them without activating them on the Sprint network and without paying for Sprint wireless service. Defendants misappropriate Sprint's expenditures for their own commercial benefit or advantage. Defendants' Scheme undermines Sprint's subsidized incentive programs and constitutes unfair competition under the common law of the State of New York.

77.     Without paying Sprint for Sprint's investment in the Sprint Phones, Defendants derive income from the sale of Sprint Phones.  Defendants' conduct in selling, inducing others to sell, and/or assisting others to sell Sprint Phones that Defendants obtained at subsidized discounted prices, undermines Sprint's subsidized incentive programs and constitutes unfair competition under the common law of the State of New York.

78.     Defendants' conduct in acquiring and/or inducing others to acquire Sprint Phones, disabling or unlocking, inducing others to disable or unlock, and/or assisting others to disable or unlock the Phones, and reselling and/or assisting others to resell the Phones as new, including re-

sale overseas for use outside the Sprint Network, undermines Sprint's subsidized incentive programs and constitutes unfair competition under the common law of the State of New York.

79.     Defendants' use of at least one of the Sprint Marks in connection with the sale of unlocked or otherwise materially different Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' products and services, and the relationship between Sprint and Defendants.

80.     Defendants' Scheme, including selling repackaged goods bearing Sprint's marks, capitalizes on Sprint's reputation and goodwill.

81.     Thus, Defendants have also engaged in unfair competition with Sprint in violation of the common law of the State of New York by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by Sprint and are thereby misappropriating the benefits of substantial effort and money expended by Sprint in establishing its rights in and to the Sprint Marks.

82.     Defendants' actions were done in bad faith; they were intentional, malicious, and willful, and have caused substantial harm to Sprint.

83.     Sprint is entitled to appropriate relief, including injunctive relief.

## COUNT TWO

### TORTIOUS INTERFERENCE WITH PROSPECTIVE
### BUSINESS RELATIONS AND ECONOMIC ADVANTAGE

84.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

85.     A business relationship, and an expectancy of business relationships, exists between Sprint and authorized dealers of Sprint Phones.

108148031.4

86.     A  business  relationship,  and  an  expectancy  of  business  relationships,  exists between Sprint and authorized retailers of Sprint Phones.

87.     A  business  relationship,  and  an  expectancy  of  business  relationships,  exists between Sprint and current and prospective Sprint customers.

88.     There is a high probability of future economic benefit to Sprint as a result of these current and prospective business relationships.

89.     Defendants have knowledge of and have intentionally and unjustifiably interfered with,  and/or  have  knowingly  facilitated  a  conspiracy  to  interfere  with,  these  current  and prospective  business  relationships  between  Sprint,  authorized  dealers  and  retailers  who  sell Sprint products, and legitimate Sprint customers or prospective customers.

90.     Specifically,  but  without  limitation,  Defendants  knew  that  Sprint  has  business relationships,  and  an  expectancy  of  business  relationships,  with  legitimate  consumers  of  Sprint Phones and wireless service.  Defendants interfered with these relationships by engaging in the Bulk Handset Trafficking Scheme and causing, at least in part, Sprint to have an insufficient supply of Sprint Phones available to meet legitimate consumer demand.

91.     Defendants  also  knew  that  Sprint  has  business  relationships  with  authorized dealers and retailers of Sprint Phones to provide said dealers with sufficient quantities of Sprint Phones  for  their  legitimate  consumers'  use  exclusively  on  Sprint's  wireless  network. Defendants' Scheme has resulted in substantial numbers of Sprint Phones that are never activated on Sprint service and has further caused shortages of available Sprint Phones, thereby substantially harming Sprint and its relationship with its authorized dealers and retailers because Sprint is unable to supply dealers with sufficient Phones to satisfy the demands from legitimate consumers.

92.     Defendants also knew that Sprint has business relationships with legitimate Sprint customers to provide them with Phones and service on the Sprint network.

93.     Defendants are intentionally interfering with Sprint's business relationships and prospective advantages through improper means and in violation of the law.

94.     Defendants engaged in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing, or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

95.     As set forth fully below, Defendants' intentional interference was committed through the use of fraud and fraudulent misrepresentations to Defendants' direct benefit and to the detriment of Sprint.

96.     Defendants' acts injured Sprint's business relationships.

97.     Sprint has been proximately damaged and continues to be damaged as a result of Defendants' interference.

98.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' tortious interference.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

99.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

100.    A contractual relationship for a specific term exists between Sprint and authorized dealers and retailers of Sprint Phones.

101.    A contractual relationship exists between Sprint and its customers, the purchasers of Sprint Phones and wireless service.

108148031.4

102.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these contracts between Sprint, and its authorized dealers and retailers and legitimate Sprint customers.

103.    Specifically, but without limitation, Defendants knew that Sprint has contractual relationships with legitimate consumers of Sprint Phones and wireless service.  Defendants interfered with these relationships by, *inter alia*, inducing runners and credit mules or other purchasers of Sprint products to breach their contracts with Sprint.

104.    Defendants also knew that Sprint has contractual relationships with authorized dealers and retailers of Sprint Phones under which these dealers and retailers will promote and sell Sprint products solely for activation on the Sprint network.  On information and belief, Defendants and/or their co-conspirators induce authorized Sprint dealers and retailers to breach their agreements with Sprint and provide new Sprint Phones to Defendants for a purpose other than activation on the Sprint network and at a financial loss to Sprint.

105.    Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct.

106.    Sprint has been proximately damaged and continues to be damaged as a result of Defendants' interference.

107.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' tortious interference.

108148031.4

## COUNT FOUR

## CONSPIRACY TO COMMIT FRAUD
## AND FRAUDULENT MISREPRESENTATION

108.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above and Paragraphs 125-133 below as though fully set forth herein.

109.    An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and altered Sprint Phones under at least one of the Sprint Marks, which results in federal common law and statutory trademark infringement, common law unfair competition, contributory trademark infringement, tortious interference with business relationships and prospective advantage, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

110.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

111.    Sprint has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

112.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' conspiracy.

## COUNT FIVE

## UNJUST ENRICHMENT

113.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

114.    By bulk acquisition of Sprint Phones at less than the manufacturer cost of the Phones for use on wireless networks other than Sprint's network, Defendants have obtained

108148031.4

benefits from Sprint which have caused significant harm to Sprint and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired new Sprint Phones.

115.    Defendants have knowingly and voluntarily obtained the benefits.

116.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Sprint the value of the benefits Defendants acquired.

117.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' unjust enrichment.

## COUNT SIX

### CONSPIRACY TO INDUCE BREACH OF CONTRACT

118.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

119.    Defendants solicit runners and credit mules to purchase Sprint Phones in bulk for Defendants' financial benefit.

120.    On information and belief, Defendants' active solicitation of runners and credit mules includes contacting these individuals and requesting that they obtain specific brands and models.

121.    Sprint had valid and existing contracts with the runners and credit mules and other original purchasers of the Phones ("Purchasers").

122.    Defendants had knowledge of the contracts between Sprint and Purchasers, and intended to, and in fact did, induce Purchasers to breach their contracts with Sprint.

123.    The breaches of the contracts were proximately caused by Defendants' misconduct.

108148031.4

124.     Sprint suffered damages as a result of the breaches of the contracts.

## COUNT SEVEN

### COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION

125.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

126.     As part of the Scheme, each of the Defendants, directly or indirectly through other co-conspirators, regularly and systematically misrepresent to Sprint that the Phones are being acquired for a legitimate purpose, that the Phones will be used by Defendants or other legitimate consumers on Sprint's wireless network, and that they will perform in accordance with the Terms and Conditions.

127.     On information and belief, each Defendant participated in defrauding Sprint, and its legitimate customers, retailers, and dealers, to acquire new Sprint Phones, including the specific models identified *supra*, for unlocking, resale, and ultimately for shipping overseas.

128.     When Defendants, directly or through their co-conspirators, acquire Sprint Phones as part of the Scheme, they do not intend to use the Phones for a legitimate purpose or to activate them or maintain them as active on Sprint's wireless network, or otherwise perform in accordance with the Terms and Conditions.

129.     Defendants and their co-conspirators know that they are required to activate the Sprint Phones for use on the Sprint wireless network, pay the monthly service charges, and otherwise comply with the Terms and Conditions.

130.     Defendants intend for Sprint to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators, to allow Defendants to acquire and unlock the Phones for improper purposes.

131.     Sprint's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances.

132.     Sprint has been damaged and continues to suffer damages as a result of Defendants' actions.

133.     There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' fraud.

## COUNT EIGHT

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

134.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

135.     The Sprint Phones that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Sprint's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Sprint's computer billing network (collectively, "Sprint's protected computer networks").  As such, the Phones act as a gateway to Sprint's protected computer networks.  Sprint restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Phones.

136.     Through their Scheme, Defendants are knowingly trafficking in the confidential codes contained in the Phones with the intent to defraud Sprint.

137.     Upon information and belief, once Defendants illicitly acquire the Sprint Phones, they use Sprint's confidential codes/passwords to gain additional access to Sprint's protected computer networks.  This additional access into Sprint's protected computer networks is not authorized in any way.  Upon information and belief, Defendants share these confidential

codes/passwords and methodologies for unlocking Sprint Phones among themselves and with their co-conspirators.

138.    Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking Sprint Phones by misrepresenting to Sprint, either directly or through one of their co-conspirators, that the Phones are being acquired and unlocked for a legitimate purpose for use by legitimate consumers on Sprint's computer networks, when in fact, they are not.

139.    Upon information and belief, Defendants unlawfully access Sprint's protected computer networks using Sprint's confidential codes/passwords to: (1) perform various tests to confirm that the Phone they are purchasing is, in fact, active on Sprint's wireless network; and/or (2) unlock the Sprint Phone, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in Sprint Phones and unauthorized changes to Sprint's protected computer networks, so that the Sprint Phone will operate on other wireless networks.

140.    Through the Scheme, Defendants are knowingly trafficking in the confidential codes/passwords contained in the Phones with the intent to defraud and harm Sprint.

141.    Defendants' transfer of the Phones and confidential codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes/passwords with intent to transfer or dispose of them.

142.    Defendants' trafficking of the Phones substantially affects interstate commerce and communication in that the codes/passwords contained in the Phones are trafficked over the internet, throughout the United States, and around the world, and Sprint's protected computer

networks are used in and affect interstate commerce and communication, and provide wireless communications services pursuant to licenses issued by the Federal Communications Commission.

143.    Defendants' trafficking of Sprint's codes/passwords has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

144.    With respect to loss, Sprint has spent well in excess of $5,000 over a one-year period assessing its hacked protected computer networks for damage and taking steps to upgrade Sprint's protected computer networks' defenses to prevent future unauthorized access by Defendants and/or their co-conspirators.

145.    Also with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period investigating Defendants' intrusions into Sprint's protected computer networks, assessing the possible impairment to the integrity of its protected computer networks and conducting damage assessment regarding Defendants collection and dissemination of Sprint Phones with the codes/passwords, as well as tracking down fraudulently sold Phones.

146.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants' access Sprint's protected computer networks without authorization.

147.    With respect to damage, by infiltrating the Sprint computer and telecommunications network and collecting and disseminating the illegally activated Phones and codes/passwords, Defendants have substantially impaired the integrity of Sprint's protected computer networks in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Sprint of the means to control the quality of its products and services.

108148031.4

148.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

149.    Defendants' conduct is intentional, malicious and willful.

150.    Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT NINE

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

151.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

152.    The Sprint Phones that are acquired by the Defendants, directly and/or from their co-conspirators in furtherance of the Scheme, are loaded with codes/passwords that access: (a) Sprint's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Sprint's computer billing network (collectively, "Sprint's protected computer networks").   Sprint restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Phones.

153.    Sprint Phones are connected to and activated on Sprint's protected computer networks when purchased from Sprint.

154.    Sprint's proprietary computer system holds confidential information and is connected to the internet, and assists in providing federally-regulated telecommunications

34

services.  Sprint's computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

155.    In furtherance of their Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire Phones from Sprint, and in so doing void any purchase agreement and any legitimate access to Sprint's computer networks.  As such, Defendants' access to the Phones and into Sprint's protected computer networks is not authorized in any way.

156.    Upon information and belief, once Defendants illicitly acquire the Sprint Phones, they use confidential codes/passwords to gain additional illegal access to Sprint's protected computer networks.  This additional access into Sprint's protected computer networks is not authorized in any way.

157.    Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking Sprint Phones by misrepresenting to Sprint, either directly or through one of their co-conspirators, that the Phones are being acquired and unlocked for a legitimate purpose for use by legitimate consumers on Sprint's computer networks, when in fact, they are not.

158.    Defendants knowingly and with the intent to defraud, cause Sprint to access its proprietary computer systems.  Defendants are not authorized to do so.

159.    Further, by illicitly acquiring and unlocking the Phones, Defendants necessarily access the Sprint protected computer networks because the Phones are connected to those networks when acquired from Sprint.

160.    Defendants acquire and, in some circumstances, unlock the Phones by misrepresenting to Sprint either directly or through a third-party agent that the Phones are being acquired and unlocked for a legitimate purpose, and for use by legitimate consumers on Sprint's

computer networks, when in fact, they are not.  Defendants use fraud and misrepresentation to acquire the Phones from Sprint, and, as such, Defendants' access of Sprint's protected computer networks is not authorized in any way.

161.    Upon information and belief, when Defendants acquire a Sprint Phone from runners and/or credit mules acting on their behalf, Defendants carefully examine the Phone, turn it on, and perform various tests to confirm that the Phone they are purchasing is, in fact, active on Sprint's wireless network and that the various electronic code numbers and access numbers loaded on the Phone are correct.  This too constitutes unauthorized access of Sprint's protected computer networks via a password obtained through fraud and misrepresentation.

162.    By trafficking in activated Sprint Phones, the Defendants are also knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Sprint's protected computer networks.

163.    Defendants' illegal and unauthorized access of Sprint's protected computer systems allows them to improperly steal Sprint's investment in its Phones.

164.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and Sprint's computer system and telecommunications network are used in and affect interstate commerce and communication, and provide wireless communications services pursuant to licenses issued by the Federal Communications Commission.

165.    Defendants' unauthorized access of Sprint's protected computer systems has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

108148031.4

166.    With respect to loss, Sprint has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 investigating and assessing the possible impairment to the integrity of its protected computer systems, taking remedial action to counteract Defendants' intrusions, and conducting a damage assessment regarding Defendants' collection and dissemination of Sprint Phones, as well as tracking down fraudulently sold Phones.

167.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Sprint's protected computer networks without authorization.

168.    With respect to damage, by infiltrating the Sprint computers systems and collecting and disseminating the illegally trafficked Phones with the codes/passwords, Defendants have substantially impaired the integrity of Sprint's systems in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Sprint of the means to control the quality of its product and service, and have stolen Sprint's financial investment in its Phones.

169.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

170.    Defendants' conduct is intentional, malicious and willful.

171.    Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT TEN

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

172.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

173.     The Sprint Phones that are acquired by the Defendants, directly and/or from their co-conspirators, in furtherance of the Scheme are loaded with codes/passwords that access: (a) Sprint's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Sprint's computer billing network (collectively, "Sprint's protected computer networks").  In addition, manufacturers that produce wireless phones for Sprint install proprietary and confidential software, ordered and paid for by Sprint, on the Sprint Phones to lock the Phones to Sprint's protected computer networks and prevent the Phones from being used outside the Sprint network.

174.     Sprint Phones are connected to and activated on Sprint's protected computer networks when purchased from Sprint.

175.     In furtherance of the Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire Phones from Sprint and in so doing void any purchase agreement and any legitimate access to Sprint's protected computer networks.  As such, Defendants' access to the Phones and into Sprint's protected computer networks is not authorized in any way.

176.     Upon information and belief, once Defendants illicitly acquire the Sprint Phones, they use confidential codes/passwords to gain additional illegal access to Sprint's protected computer networks.  This additional access into Sprint's protected computer networks is not authorized in any way.

108148031.4

177.    Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking Sprint Phones by misrepresenting to Sprint, either directly or through one of their co-conspirators, that the Phones are being acquired and unlocked for a legitimate purpose for use by legitimate consumers on Sprint's computer networks, when in fact, they are not.

178.    Upon information and belief, Defendants unlawfully hack into Sprint's protected computer networks using confidential codes/passwords to: (1) perform various tests to confirm that the Phone they are purchasing is, in fact, active on Sprint's wireless network; and/or (2) unlock the Sprint Phone, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in Sprint Phones and unauthorized changes to Sprint's protected computer networks, so that the Sprint Phone will operate on other wireless networks.

179.    Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Sprint's protected computer networks.

180.    Defendants' access of Sprint's protected computer systems allows them to improperly steal Sprint's substantial financial investment in its Phones.

181.    Sprint's protected computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

182.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and Sprint's computer system and telecommunications network are used in and affect interstate commerce and communication, and provide wireless telecommunications service pursuant to licenses issued by the Federal Communications Commission.

183.    Defendants' unauthorized access of Sprint's protected computer systems has caused and will continue to cause Sprint to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

184.    With respect to loss, Sprint has spent well in excess of $5,000 over a one-year period assessing its hacked protected computer networks for damage and taking steps to upgrade Sprint's protected computer networks' defenses to prevent future unauthorized access by Defendants and/or their co-conspirators.

185.    In addition, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period identifying the impairment of or damage to Sprint's protected computer networks that Defendants' and/or their co-conspirators accessed with authorization.

186.    Further, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs associated with investigating Defendants' and/or their co-conspirators' intrusions into Sprint's protected computer networks and taking subsequent remedial measures.

187.    Moreover, with respect to loss, Sprint has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants' accessed Sprint's protected computer networks without authorization.

188.    With respect to damage, by infiltrating the Sprint computers systems and collecting and disseminating the illegally obtained Phones, Defendants have substantially impaired the integrity of Sprint's systems in an amount in excess of $5,000.   Moreover, Defendants' actions have deprived Sprint of the means to control the quality of its product and service, and have stolen Sprint's financial investment in its Phones.

108148031.4

189.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

190.     Defendants' conduct is intentional, fraudulent, malicious and willful.

191.     Pursuant to 18 U.S.C. § 1030(g), Sprint is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Sprint and its customers as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT ELEVEN

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]

192.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

193.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered Sprint Communications Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially altered Sprint Phones, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the Sprint Phone package.

194.     Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks in connection with the sale of Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Sprint Communications and Defendants.

195.    Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered Sprint Communications Marks in connection with their participation in the Scheme is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of Sprint Communications.

196.    Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks in connection with the materially different Sprint Phones, which are unlocked and/or do not include warranties, manuals, accessories and related items that are part of the Sprint Phone package, and/or have been flagged as "Bad ESN" Phones and not able to be activated on the Sprint network, constitutes a misappropriation of Sprint Communications' distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by Sprint Communications over a long period of time.

197.    Defendants' and/or their co-conspirators' use of certain federally-registered Sprint Communications Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Sprint Communications, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Sprint Communications.

198.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Sprint Communications and the reputation and goodwill of Sprint Communications, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Sprint Communications.

108148031.4

199.    Sprint Communications is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

200.    Defendants' aforesaid acts constitute willful infringement of Sprint Communications' aforementioned federally registered trademarks in violation of 15 U.S.C. § 1114.

## COUNT TWELVE

**FEDERAL COMMON LAW TRADEMARK INFRINGEMENT
AND FALSE ADVERTISING
15 U.S.C. § 1125 (a)(1)(A) and (B) [§ 43(a) of the Lanham Act]**

201.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

202.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the Sprint Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked and/or otherwise materially different Sprint Phones, which downstream customers will discover have been altered from their original state, are inoperable on the Sprint wireless network, and/or do not include the warranties, accessories, manuals and related items that constitute part of the Sprint Phone package.

203.    Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks in connection with the sale of unlocked and/or otherwise materially different Sprint Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially altered products, and the relationship between Sprint and Defendants.

108148031.4

204.     Defendants' and/or their co-conspirators' unauthorized use of at least one of the Sprint Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Sprint.

205.     Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks in connection with the unlocked and/or otherwise materially different Sprint Phones, including Sprint Phones which do not include warranties, manuals, accessories and related items that are part of the Sprint Phone package and/or may have been flagged as "Bad ESN" Phones and not able to be activated on the Sprint network, constitutes a misappropriation of at least one of the distinguishing and identifying Sprint Marks that was created as a result of significant effort and expense.

206.     Defendants' and/or their co-conspirators' use of at least one of the Sprint Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Sprint, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Sprint.  Defendants are not affiliated with Sprint in any way.

207.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Sprint and the reputation and goodwill of Sprint, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Sprint.

208.     Sprint is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

108148031.4

209.    Defendants' use of at least one of the Sprint Marks in commercial advertising or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products. Defendants' advertising and promotion is false or misleading.  Defendants' advertising and promotion deceives or has the capacity to deceive consumers.   The deception and misrepresentations have a material effect on the purchasing decisions and affect interstate commerce.

210.    Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B).

211.    Sprint is entitled to appropriate relief as prayed for hereinafter, including preliminary and permanent injunctive relief.

212.    Defendants knew or should have known that Plaintiffs are the owners and/or authorized licensees of the Sprint Marks and that Defendants had no legal right to use any of the Sprint Marks on their infringing products.

213.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiffs' lost profits, Defendants' profits, and Plaintiffs' attorneys' fees.

<u>COUNT THIRTEEN</u>

**CONTRIBUTORY TRADEMARK INFRINGEMENT**

214.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

215.    By misappropriating and using at least one of the Sprint Marks in connection with the Bulk Handset Trafficking Scheme, Defendants knowingly aided and enabled distributors

and/or sellers of their products to market them to members of the general public in a way that infringes at least one of the Sprint Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

216.    Defendants' unlawful, unauthorized, and unlicensed sale of the unlocked Sprint Phones has contributed to the creation of express and implied misrepresentations that the Sprint Phones, as sold by Defendants, were created, authorized or approved by Sprint, may be activated on the Sprint network, and include warranties.

217.    Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase Sprint Phones altered by Defendants to believe that they are purchasing handsets approved by Sprint that can be activated on the Sprint network and containing original warranties.

218.    Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

219.    Sprint has been damaged and continues to suffer damages as a result of Defendants' actions.

220.    There is no adequate remedy at law to fully compensate Sprint for the harm caused by Defendants' actions.

## COUNT FOURTEEN

### CONVERSION

221.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

222.    Defendants have and are engaged in acts of conversion in violation of the law of the State of New York.

108148031.4

223.    Sprint has the right to provide its Phones and wireless service to the public. Defendants have no such privilege or right.

224.    Defendants knew or should have known that they obtained the Phones through illegitimate means and had no legal right to advertise, use or resell them.

225.    Defendants are wrongfully interfering with Sprint's rights by engaging in the Bulk Handset Trafficking Scheme.

226.    Defendants intentionally and willfully exerted dominion and ownership over the Sprint Phones.

227.    Defendants' conversion of Sprint's property has caused and continues to cause Sprint to suffer irreparable injury, loss of reputation, and exemplary damages to be proved at trial.  Unless enjoined by this Court, Defendants will continue these acts, thereby causing Sprint further immediate and irreparable damage.

## COUNT FIFTEEN

### FALSE ADVERTISING IN VIOLATION OF
### N.Y. GEN. BUS. LAW § 350, ET SEQ.

228.    Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

229.    Defendants have used and are using the Sprint Marks in connection with their illegal Bulk Handset Trafficking Scheme.  Accordingly, Defendants have made and are making express and implied misrepresentations that their businesses, websites, products and/or services originate with, are associated with, and/or are sponsored or endorsed by Sprint in such a manner as to create a likelihood of confusion among consumers, thereby inducing the belief that, contrary to fact, Defendants are sponsored or otherwise approved by or connected with Sprint.

230.     In making representations that their products, services and advertisements originate with or are endorsed or sponsored by Sprint by displaying the Sprint Marks in their advertisements, the Defendants knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading and so acted in violation of N.Y. Gen. Bus. Law § 350, *et seq*.

231.     Defendants' actions in connection with the illegal Bulk Handset Trafficking Scheme have caused specific and substantial injury to the public over and above ordinary trademark infringement as more particularly set forth above.

232.     Defendants acted without consent from Sprint and Defendants' conduct has resulted in substantial harm to Sprint as more particularly set forth above.

233.     Sprint requests permanent injunctive relief against Defendants pursuant to N.Y. Gen. Bus. Law § 350, *et seq*.

## COUNT SIXTEEN

### DECEPTIVE ACTS AND PRACTICES
### IN VIOLATION OF N.Y. GEN. BUS. LAW § 349

234.     Sprint reasserts the allegations set forth in Paragraphs 1 through 74 above as though fully set forth herein.

235.     Defendants have and are engaged in fraudulent acts or practices in violation of the prohibition against deceptive acts and practices found at N.Y. Gen. Bus. Law § 349.

236.     Defendants have used and are using the Sprint Marks in connection with the above-described Bulk Handset Trafficking Scheme in such a manner as to misrepresent the source, sponsorship, approval, and/or certification of their products and services.  The use of the Sprint Marks by Defendants creates an unreasonable risk that present and potential consumers

108148031.4

may falsely conclude that there exists some affiliation, connection, or association between and among Sprint and Defendants.

237.    Defendants' deceptive acts are directed at consumers, are misleading in a substantial and material way, and have caused injury to Sprint and its customers as more particularly set forth above.

238.    Defendants had actual knowledge of Sprint's rights at the time they decided to use the Sprint Marks in connection with the Bulk Handset Trafficking Scheme.  Thus, Defendants acted willfully and deliberately.

239.    Defendants' unfair business practices are of a recurring nature and harmful to consumers and the public at large, as well as to Sprint.  These practices constitute unlawful, unfair, fraudulent, and deceptive business practices, and unfair, deceptive, untrue, and misleading advertising.

240.    Defendants' actions in connection with the illegal Bulk Handset Trafficking Scheme have caused specific and substantial injury to the public over and above ordinary trademark infringement as more particularly set forth above.

241.    Defendants acted without consent from Sprint and Defendants' conduct has resulted in substantial harm to Sprint as more particularly set forth above.

242.    Sprint requests permanent injunctive relief against Defendants pursuant to N.Y. Gen. Bus. Law § 349.

## DEMAND FOR JURY TRIAL

Sprint demands a trial by jury on all triable issues.

108148031.4

WHEREFORE, Plaintiffs Sprint Solutions, Inc. and Sprint Communications Company L.P., respectfully request that this Court enter final judgment and permanent injunctive relief in favor of the Plaintiffs and against Defendants, as follows:

(a) awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b) awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c) granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(d) requiring Defendants, pursuant to the Lanham Act, to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the Sprint Marks or a confusingly similar copy thereof; and

(e) granting such further relief as this Court deems just and proper.

Respectfully submitted this 28th day of July, 2016.

CARLTON FIELDS JORDEN BURT, P.A.

By: *s/ Nora A. Valenza-Frost*
    Nora A. Valenza-Frost (NV7787)
    Email: nvalenza-frost@carltonfields.com
    405 Lexington Avenue, 36th Floor
    New York, New York 10174
    Phone: (212) 785-2577
    Fax:    (212) 785-5203

    Jennifer A. Yasko (JY 4034)
    Email: jyasko@CFJBLaw.com
    James B. Baldinger

50

Florida Bar No. 869899
Email: jbaldinger@CFJBLaw.com
*To be admitted pro hac vice*
Stacey K. Sutton
Florida Bar No. 0289530
Email: ssutton@CFJBLaw.com
*To be admitted pro hac vice*
**CARLTON FIELDS JORDEN BURT, P.A.**
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Phone: (561) 659-7070
Fax: (561) 659-7368

Gail E. Podolsky
Georgia Bar No. 142021
Email: gpodolsky@CFJBLaw.com
*To be admitted pro hac vice*
**CARLTON FIELDS JORDEN BURT, P.A.**
One Atlantic Center
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309
Phone: (404) 815-2714
Fax: (404) 815-3415

*Attorneys for Sprint Solutions, Inc. and
Sprint Communications Company L.P.*

108148031.4